IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KEITH DEREK COLVERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:11CV293-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Keith Derek Colvert brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance benefits and supplemental

security income under the Social Security Act.  The parties have consented to entry of final

judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record

and briefs submitted by the parties, the court concludes that the decision of the Commissioner

is due to be reversed.

## BACKGROUND

Plaintiff was born in 1958 and completed high school in 1976. (R. 156, 158). He

reported past military service in the Navy from July 1976 through December 1983 and past

work as letter sorting machine operator for the U.S. Postal Service from April 1984 through

November 1991, and as a medical admissions clerk/typist at the VA hospital from April 1993

through March 2006.  (R. 132-34, 181-84).  He filed applications for benefits under Title II and Title XVI on June 27, 2006, alleging disability since March 19, 2006 due to degenerative disc disease and carpal tunnel syndrome. (R. 132-39, 151). At the time he filed his applications, plaintiff reported that he was homeless, that he went out walking daily to panhandle and find food at stores or in dumpsters, that he read for about an hour per day, and that his social activities consisted of "watch[ing] trains come and go."  (R. 162-64).[1]  He reported daily activities of "sitting down mostly," but indicated that he must shift his weight due to discomfort.  (R. 168).  He reported that, due to back pain, he can stand and walk for five to ten minutes each, and that he is able to sit for "2 Hrs +[.]" (Id.).  While standing, he leans on his cane to "ease the load" on his back and he walks "humped" because he "find[s] some relief in this position." (Id.).

After plaintiff's applications were denied initially on October 23, 2006, he requested a hearing before an ALJ.  (R. 69-82, 88).  An ALJ conducted an administrative hearing on January 14, 2009, and heard testimony from the plaintiff, a vocational expert, and a psychologist.  (R. 33-68).[2]  In a decision issued on March 30, 2009, the ALJ concluded that plaintiff suffers from severe impairments of degenerative disk disease at L5-S1 with a herniated disk, degenerative disk disease of the cervical spine, bilateral carpal tunnel

---

[1]  Shortly after he filed his applications for benefits, plaintiff moved in with his sister and her family. (R. 38; see also R. 310).

[2]  The psychologist testified, based on her review of the record, that she saw "no evidence of any functional limitations from a mental health perspective."  (R. 60-61).

syndrome and chronic obstructive pulmonary disease and a non-severe anxiety related disorder. The ALJ concluded that plaintiff does not have an impairment or a combination of impairments that meets or medically equals the listings, and that he retains the residual functional capacity to perform a full range of light work exertionally, with non-exertional limitations to: frequent pushing and pulling of arm controls, simple grasping, and fingering; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; and no work in environments requiring exposure to extreme cold or wetness, vibration, or hazardous conditions including unprotected heights, dangerous machinery or uneven surfaces. The ALJ further concluded that plaintiff retains the RFC to perform his past relevant work as an admitting clerk and, therefore, that he has not been under a disability as defined in the Social Security Act since his alleged onset date. (R. 18-32). On February 15, 2011, the Appeals Council denied plaintiff's request for review (R. 1-5) and, accordingly, the ALJ's decision denying benefits stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145.

Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  <u>Davis</u>, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  <u>Cornelius</u>, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ erred in assessing the credibility of his pain testimony and, further, that the evidence supports a finding of disability under the medical-vocational rules (the "grids") from approximately plaintiff's 50th birthday.  (Doc. # 11, p. 1).  In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992).  Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints.  However, if the testimony is critical, the ALJ

must articulate specific reasons for rejecting the testimony. Id.[3] "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." Dyer, supra, 395 F.3d at 1210 (citations and internal quotation marks omitted).

In the present case, the ALJ concluded that the evidence satisfied the requirements of the pain standard, i.e., "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]" (R. 29). However, he concluded that plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" were only partially credible. (R. 29-30). As he is required to do in these circumstances, the ALJ articulated his reasons for discounting plaintiff's testimony of disabling symptoms resulting from his COPD (R. 29-30), his carpal tunnel syndrome (R. 30), and the impairments involving plaintiff's back, neck and spine (id.). Plaintiff's arguments before this court relate only to the ALJ's assessment of plaintiff's testimony of limitations

---

[3] See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

resulting from the impairments of his lumbar and cervical spine. (Doc. # 11, pp. 6-8).[4]  In assessing plaintiff's testimony regarding the limiting effects of these impairments, the ALJ reasoned:

> As to the claimant's impairments involving his back, neck, and spine, I find that medical evidence indicates that the claimant is partially credible regarding his reports of pain and limitation. However, I find that the claimant's pain does not limit him to the extent he has alleged. The claimant reported that he spends his days walking and looking for food. He also testified and reported that when he was not out scourging for food that he spent his days just sitting. He testified that a physician prescribed the use of a cane. The medical evidence clearly shows that the claimant requested a cane and received a cane per his request.  There is not a single medical note suggesting that the claimant cannot sit, stand or walk. Still interpreting the evidence in the best interest of the claimant, I do note that the conditions affecting his neck, back, and spine have worsened and there is continuing degenerative activity. One of the last VA notes highlighted above boldly suggests that the claimant's impairments needed attention.  However, just like with the carpal tunnel syndrome, every physician the claimant visited recommended surgery. There is not a single note or suggestion that not having surgery was a better course of action. VA personnel have religiously broached the subject of surgery with the claimant and he has refused to heed their advice. I therefore find that the medical evidence does not support the claimant's contention that impairments to his neck, back, and spine prevent the claimant from working.
>
> Further, even assuming arguendo that the claimant were found disabled, I find that the claimant failed to follow medical treatment and that based upon all the evidence of record in the file, I conclude that following the advi[c]e and repeated urges to have surgery given by the claimant's doctors would have resulted in definite improvement in his alleged disabling conditions, and would have restored the claimant to Substantial Gainful Activity.

(R. 30).

To be legally sufficient, the reasons articulated by an ALJ for rejecting a claimant's

---

[4]  The court discusses only the conclusions alleged by plaintiff to demonstrate reversible error and the evidence relevant to those conclusions.

pain testimony must be both adequate and supported by substantial evidence of record. See Kalishek v. Commissioner of Social Security, 2012 WL 1938991 (11th Cir. May 30, 2012)("[I]f the ALJ clearly articulates adequate reasons for its finding, and there is substantial supporting evidence in the record, we will not disturb the credibility finding on review.")(citing Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995)). In this case, the reasons stated by the ALJ for discounting plaintiff's testimony regarding his back and neck pain are inadequate and/or not supported by substantial evidence.

In challenging the ALJ's credibility determination, plaintiff points to the objective evidence of his impairments, as demonstrated in his treatment records from August and September 2006 and to his consultative examination in October 2006. (Id., pp. 6-7). Upon physical examination on August 15, 2006, Dr. Tai Chung's impressions were bilateral carpal tunnel syndrome and possible lumbar disc herniation. He recommended an MRI of plaintiff's lumbar spine, a repeat EMG/NCV study, and that plaintiff return to him for follow-up after the tests. He stated, "I do not think that he can return to work *in the meantime*." (R. 286)(emphasis added).[5]  Plaintiff's lumbar spine MRI revealed degenerative disc disease, "especially a L5/S1 disc herniation." (R. 292-93). On August 18, 2006, after reviewing the MRI result, Dr. Chung wrote, "He has had this problem for so long now, I think that surgery is most appropriate. We will get him set up to see Dr. Holt to see if surgery is best at this

---

[5]  Plaintiff's counsel describes Dr. Chung's note in a manner that, while technically accurate, is not entirely candid. Plaintiff argues, "Even before the repeat objective testing, this physician concluded – I do not think he can return to work (R. 286)." However, Dr. Chung's note makes clear that the work restriction "in the meantime" meant until Dr. Chung evaluated the results of testing. (R. 286).

time." (R. 293).[6]  The EMG/NCV showed "evidence of right C5/C6 radiculopathy" and Dr. Chung, accordingly, ordered an "MRI scan of the cervical spine to see if he has any nerve root compression."  (R. 290-91).  The cervical spine MRI was conducted on September 6, 2006, and showed "degenerative change of moderate severity with moderate thecal sac encroachment and marked right neural foraminal stenosis" at C5-6 and "mild changes of degenerative disc disease at C3-4 and C4-5."  (R. 288).  On September 8, 2006, Dr. Chung wrote, "MRI scan of the cervical spine showed C5/6 disc disease with right neural foraminal stenosis. . . . He may need an operation.  He has seen Dr. Holt only for his low back pain.  I think he should see Dr. Holt for his neck problem as well to see if surgery is beneficial."  (R. 289).[7]

After performing a consultative physical examination on  October 4, 2006, Dr. James Colley assessed lumbar and cervical degenerative disc disease with left lower extremity radiculopathy and bilateral cervical radiculitis.[8]  (R. 309-15).  On neurological examination, as plaintiff argues, Dr. Colley noted decreased sensation "in neural dermatome C6 bilaterally to pinprick," "in the left lower extremity in neural dermatomes L4, L5, and S1 as well as the left lateral calf and plantar surface of the foot."  (R. 314).  Dr. Colley noted "trigger point

---

[6]  The record includes what appears to be a partial treatment note for plaintiff's visit to Dr. Holt on August 31, 2006 "for a second opinion on his MRI." (R. 285). The note does not include any physical examination results, nor does it include Dr. Holt's assessment or recommendation. (Id.).

[7]  The parties cite no evidence of a return visit to Dr. Holt, and the court found no such treatment record in the administrative transcript.

[8]  He further assessed bilateral carpal tunnel syndrome and "[c]hronic intermittent bronchitis with ongoing tobacco abuse versus mild chronic obstructive pulmonary disease."  (R. 314-15).

tenderness at L3-L4 and L4-L5 with paravertebral muscle spasms[,]" but "no paravertebral muscle spasms or trigger point tenderness of the posterior cervical spine."  (Id.).

In discounting plaintiff's testimony of pain resulting from the impairments of his lumbar and cervical spine, the ALJ first relies on plaintiff's daily activity: "The claimant reported that he spends his days walking and looking for food.  He also testified and reported that when he was not out scourging for food that he spent his days just sitting." (R. 30). However, the ALJ's statement implies a higher level of activity than is actually reflected by plaintiff's responses in the questionnaires he submitted in support of his applications.  In the questionnaires he completed in July 2006, plaintiff stated that his "[d]aily activities consist of sitting down *mostly*." (R. 168)(emphasis added).  Plaintiff indicated that he was homeless, had "no car," and "go[es] out daily to find food" at stores with dumpsters and that he goes to places of business to "panhandle."  (R. 164, 172). He wrote, "I walk to find food.  I take my time, go at a time when I know the dumpster[s] will have food in them. I do not live in a regular house. I[t] takes me 15-25 min[ute]s to walk slowly to get food, if it[']s there." (Id.). He reported, "I walk humped because I find some relief in this position." (R. 168). Additionally, plaintiff did not "testif[y]" – as indicated by the ALJ – that "when he was not out scourging for food that he spent his days just sitting."  (See R. 30).  At the January 2009 hearing, plaintiff testified that he had been living with his sister for two and a half years. (R. 38).[9]  When the ALJ questioned plaintiff about his daily activities there, plaintiff

---

[9]  At his consultative examination on October 4, 2006 – just a few months after he filed the present applications – plaintiff told the doctor that he lived with his sister.  (R. 310).

responded that he gets "maybe three" hours of uninterrupted sleep due to his pain and having to adjust his position (R. 53), that he lies down about three times during the day to relieve his back and neck pain (R. 41-44), and that he watches television, reads, makes his bed, keeps his room clean, "may wash a dish or two," goes to church and bible study, and visits friends and family. (R. 54-56). He further testified that his sister or other family members perform chores like sweeping, mopping, and vacuuming and that, when he goes shopping with them at Walmart, he rides in the motorized cart. (R. 55). The ALJ summarized this testimony and plaintiff's questionnaire responses in his initial description of the evidence. (R. 23-25). However, the reason the ALJ gave for discounting plaintiff's testimony of pain from his spinal impairments – that he "spends his days walking and looking for food" – is not a fair characterization of the record. Additionally, the court cannot endorse the suggestion that the act of walking slowly to search for food during the times of day that the dumpsters have food in them – on the part of a homeless person who has no car – is necessarily inconsistent with a severe level of pain. Accordingly, the court finds that this stated reason does not provide an adequate basis for discounting the plaintiff's pain testimony.

The ALJ next points to plaintiff's testimony that "a physician prescribed the use of a cane," and states that "the medical evidence clearly shows that the claimant requested a cane and received a cane per his request." (R. 30). The ALJ does not specify whether he finds this evidence significant as an inconsistency suggesting that plaintiff was not truthful at the hearing, or as an indication that plaintiff's pain is not severe enough to require the use of a cane, since no physician prescribed one. Either way, this reason also is unsupported by

substantial evidence.  At plaintiff's consultative physical examination on October 4, 2006, plaintiff told the doctor that he had requested the cane. In the history portion of his report, Dr. Colley wrote, "He states that he can walk for about two blocks with or without his cane that he asked for and obtained through the Veteran's Administration." (R. 310).  In recording his assessment upon physical examination, Dr. Colley indicated, "He uses a single-point cane that he requested from the Veteran's Administration and might be needed on uneven terrain." (R. 312).  At the hearing, plaintiff responded to the ALJ's questions as follows:

> Q      Do you use a cane and/or a walker or a crutch?
>
> A      Yeah, I, I use a cane.
>
> Q      Did anyone prescribe the cane, or?
>
> A      Yes. Dr. Ingram (PHONETIC) did.
>
> Q      Dr. Ingram?
>
> A      Um-hum.

(R. 44).  The ALJ did not ask any further questions regarding the cane.  Although the record shows that plaintiff did request a cane, plaintiff's medical treatment records from the VA further establish that – just as plaintiff testified – Dr. Ingram thereafter prescribed it. At 10:54 a.m. on August 14, 2006, Dr. Judith A. Ingram, the Manager of the VA's Primary Care Outpatient Clinic, recorded a note in plaintiff's record that the "veteran would like to have a cane, tens unit[.]" (R. 510).  She issued an order for a cane to the VA's prosthetics service, listing plaintiff's diagnosis of chronic low back pain.  (R. 401-02).  Just over half an hour later, at 11:27 a.m., John Baker entered a note in plaintiff's record listing the status of action

on Dr. Ingram's order as "COMPLETE" and updating the record to reflect that he had "ISSUED CANE TO VETERAN." (R. 402).[10] Thus, the ALJ's reasoning as to plaintiff's cane is not supported by the record.

The ALJ acknowledges that the condition of plaintiff's back, neck and spine has worsened, that there is "continuing degenerative activity," and that "one of the last VA notes highlighted above boldly suggests that the claimant's impairments needed attention." (R. 30). However, the ALJ suggests that "every physician the claimant visited recommended surgery," that "[t]here is not a single note or suggestion that not having surgery was a better course of action," that "VA personnel have religiously broached the subject of surgery with the claimant and he has failed to heed their advice." (R. 30). The ALJ again overstates the evidence of record. At the hearing, the ALJ questioned plaintiff as follows:

> Q    The one question I, I did have, I mean there's particular notes that surgery was recommended, and you chose not to have the surgeries. Why was that?
>
> A    Well, being around a lot of veterans, I hear different reports of man, don't do that, you know you'll be [in] better shape if you just deal with the pain because I'm worse off now after I had surgery, and you know, I've heard that more than, than having surgery would be able to correct the problem. So, I, I guess if, if this gets worse and worse and worse, I, I don't know, maybe I will, but, but just listening at the advice of other people you know even family members you know recommend that. You know that's evasive.

---

[10] As to plaintiff's request for a TENS unit Dr. Ingram entered a "consult request" to the VA's outpatient Physical Medicine & Rehabilitation clinic. On August 24, 2006, Dr. Sreelatha Katari of that clinic evaluated the plaintiff and prescribed therapy and TENS training. (R. 399-400, 509-10; see also R. 502 ("[H]e did see our physiatrist, Dr. Katari, 8/06"). Dr. Katari issued a prosthetics request order for a TENS unit, citing plaintiff's diagnosis – after reviewing his MRI – as "[d]egeneration of lumbar or lumbosacral intervertebral disc." (R. 396-99).

Q      Did they recommend surgery both on your neck and low back?

A      Yeah, I believe so.  I, I'm sure the, I'm sure the low back.  I, I believe it, yes.

(R. 58-59).

The medical evidence of record in fact includes only one recommendation from a physician, Dr. Chung, regarding back surgery; Dr. Chung's recommendation, however, was tentative.[11]  In his treatment note for plaintiff's office visit on August 18, 2006, after reviewing plaintiff's MRI, Dr. Chung wrote, "Discuss options with him. He has had this problem for so long now, I think that surgery is most appropriate.  *We will get him set up to see Dr. Holt to see if surgery is best at this time.*" (R. 293)(emphasis added). As noted above, the treatment note for plaintiff's August 31, 2006, visit to Dr. Holt appears to be incomplete and does not include any opinion or recommendation from the physician. (R. 285). On September 6, 2006, plaintiff had a cervical MRI and, on September 8, 2006, he returned to see Dr. Chung. In his note for this visit, Dr. Chung wrote, "Discuss options with him. He *may* need an operation. He has seen Dr. Holt only for his low back pain. I think he should see Dr. Holt for his neck problem as well *to see if surgery is beneficial*." (R. 288-89)(emphases added). No treatment notes evidence further evaluation by Dr. Chung or Dr. Holt.  Other than Dr. Chung's comments, there is no evidence of record of any surgeon's or other physician's prediction of the probability of a successful surgical outcome in plaintiff's particular case,

---

[11]  The VA medical record includes notations about possible surgery for plaintiff's bilateral carpal tunnel syndrome. (See, *e.g.*, R. 217). Plaintiff did not challenge the ALJ's credibility determination regarding symptoms from carpal tunnel syndrome (see R. 30, first complete paragraph) and the court here discusses only the evidence regarding plaintiff's spinal impairments.

or of the level of pain relief surgery would afford the plaintiff.

The ALJ's summary of the evidence as to plaintiff's treatment for lumbar and cervical impairments also includes a number of errors.[12] The ALJ writes that, on April 4, 2006, "approximately two weeks after the alleged onset date[,]. . . . [t]he claimant *requested* a cane and a TENS unit, presumably for his back, however his pain was again assessed as '0'." (R. 26). However, plaintiff's request for a cane and TENS unit occurred on August 14, 2006, not on April 4, 2006. In the medical note documenting plaintiff's request for the cane and TENS unit, all of plaintiff's vital signs – including a pain report of "0" – were simply carried over from an earlier clinic visit on April 4, 2006. (See Exhibit 2F, R. 251-52)(labeled "AMBULATORY/OUTPATIENT CARE NOTE: August 14, 2006," including notes signed electronically by Dr. Ingram on August 14th and August 15th, but vital signs dated "04/04/06"); compare with Exhibit 1F, R. 211-12 (plaintiff's April 4, 2006 visit to clinic complaining of chest pain off and on for a year but denying pain at that time; including the same vital signs as R. 252). The ALJ notes that "[t]he Veteran's Administration also started

---

[12] This is also true as to the ALJ's summary of the evidence on plaintiff's carpal tunnel syndrome and arm pain. The ALJ discusses plaintiff's November 1, 2005, visit for evaluation of his carpal tunnel syndrome. (R. 25). He then reports that the plaintiff returned to the orthopedic clinic on March 2, 2006; however, the orthopedic medical evidence the ALJ describes for that visit pertains, instead, to plaintiff's November 1, 2005 visit to the clinic. As the ALJ further noted – correctly – plaintiff sought treatment on March 2, 2006 for diarrhea. (See R. 26, 212-218). The ALJ also describes a May 1, *2007,* examination of the strength and range of motion of plaintiff's upper extremities after plaintiff's earlier complaint of left elbow pain. (R. 28, middle of first paragraph, citing Exhibit 7F, p. 6). In the next paragraph, the ALJ notes, "On May 1, 2008, the claimant's hands and arms were examined. *The scores were identical to the scores reported a year earlier* (see Exhibit 7F, pg 6 and Exhibit 8F, pg 82)." (R. 28-29)(emphasis added). A comparison of the two exhibits cited by the ALJ reveals good reason for the identical scores – both exhibits document the very *same* occupational therapy evaluation, one that occurred on May 1, 2008. (See R. 328-35, 430-35).

treatment on his back with heat, TENS, and stretching exercises *in anticipation of surgery in the civilian sector* (Exhibit 3F, pg 29)." (R. 27)(emphasis added).  This observation is correct for the most part, except that the note does not refer to anticipated surgery but, instead, to plaintiff's "appointment later this month with surgeon in private sector." This distinction might appear minor, if not for the ALJ's emphasis on plaintiff's failure to comply with repeated recommendations to have surgery.

The ALJ observes that, on November 22, 2006, plaintiff reported back and right arm pain at a level of "7" but that, "[a]pproximately two hours later the claimant reported his pain was a '5' but it was his back." (R. 27). The ALJ's summary of this visit suggests that he views plaintiff's report of back and arm pain at a level of "7" to be contradicted by plaintiff's report "[a]pproximately two hours later" of only back pain, and at a level of only "5." (R. 27). However, plaintiff did not, in fact, complain of right arm pain during this visit. Plaintiff's treatment notes for that date indicate that he stated on intake screening that he needed "some pain medication for [his] back" and, at 10:45 a.m., reported a pain level of "7." (R. 506)(primary care nursing screening note).  An hour later, at 11:42 a.m., certified nurse practitioner Chancey Barnes evaluated the plaintiff.  Plaintiff again stated that he needed some pain medication for his back.  (R. 501).  Nurse Practitioner Barnes wrote an order for "toradol 60 mg deep im now - then observe x 30 minutes before []release (brother is driving)."  (R. 502).  At 12:20 p.m., LPN Margaret Ewell noted, "Patient received Toradol 60 mg IM in left deltoid without problem as order per Mr. Barnes. Lot # 402522/Exp. 07/08. We will observe after 30 minutes for pain status." (R. 509)(original all capitalized). At 12:58

p.m., RN Theodora Flowers entered a note indicating plaintiff's "Current Pain Rating: 7," "Location of Pain: back & right[,]"[13] and "DIAGNOSIS pertinent to pain: herniated disc[.]" (R. 498-99; complete pain assessment note at R. 498-501).  At 13:06 p.m., RN Flowers recorded plaintiff's "Current Pain Rating: 5" and "Location of Pain: back[.]" (R. 490-91).  At 13:08 p.m., RN Flowers completed her primary care "nursing exit interview," noting the status of plaintiff's treatment in the primary care clinic as "COMPLETED." (R. 490). Thus, as noted above, plaintiff did not complain of right arm pain. Further, while he did report a reduced back pain level about two hours after he initially presented to the clinic, the ALJ fails to acknowledge that this report of reduced pain was preceded by a Toradol shot.

The ALJ notes that plaintiff "was again examined by MRI" on March 21, 2007, and he describes the results of the "MRI" of plaintiff's hands and lumbar spine. (R. 27).  The ALJ concludes the description by noting that "[t]he VA uses primary diagnostic coding," that "the claimant's code was assessed as *minor abnormality*" and, further, that "[t]he claimant underwent a physical examination based on the results of the MRIs.... . The claimant reported that the pain was sharp and the intensity ranged from '6/7 – 10.'  On this particular date the claimant stated his pain was an '8.'" (R. 27)(emphasis in original).  This summary is, again, only partly correct.  Dr. Shalini Goswami examined plaintiff for his "LBP" beginning at 9:42 a.m. on March 21, 2007.  Plaintiff reported "sharp shooting pain radiating down the LLE, *6-*

---

[13]  The ALJ apparently interprets this note to mean that plaintiff had complained of back pain and right *arm* pain.  However, Flowers does not note a complaint of arm pain.

*7/10* in intensity[.]" (R. 475)(original all capitalized)(emphasis added).[14]   After examining the plaintiff, Dr. Goswami wrote, "Will also obtain *xray* L-S spine & both hands. Pt also advised to bring films of MRI from outside VA to be ref[]erred to neurosurgeon in Birmingham." (Id.)(original capitalized)(emphasis added). Dr. Goswami signed the treatment note at 10:12 a.m.  (Id.).[15] The results the ALJ describes as those of the "MRI" preceding plaintiff's physical examination are, instead, results of the xrays performed at 10:40 a.m., pursuant to Dr. Goswami's order.  (R. 356).  The xray results are, as the ALJ notes, coded as "minor abnormality."  (Id.).  However, plaintiff's report of a pain level of "8" was not on this date, as the ALJ states; instead, it occurred on plaintiff's earlier visit on March 2, 2007. (R. 476).[16, 17]

The ALJ's description of the evidence following Dr. Chung's recommendations for back and neck surgery (see R. 27, top paragraph) includes many references to surgery being recommended and/or declined. In the first of these, the ALJ observes that, on March 2, 2007, "[t]he claimant did not mention surgery." (R. 27). However, the record does not reveal

---

[14]  Dr. Goswami's note indicates that plaintiff reported pain of 6-7 on a scale of ten not – as the ALJ quoted the record  – that plaintiff reported that his pain "intensity ranged from '6/7 – 10." (R. 27).

[15]  The note does not include a recommendation for surgery by Dr. Goswami; the record does not include evaluation notes including any such recommendation from a neurosurgeon in Birmingham.

[16]  Immediately preceding his discussion of the "MRI" results, the ALJ describes plaintiff's March 2, 2007 pain report of "8," attributing it to the correct treatment date.  (See R. 27 (citing Exhibit 8F, pp. 128-130 ("pgs 128 1-30")); R. 476-83).

[17]  The ALJ describes plaintiff's treatment on "May 1, 2007" and May 14, 2007" (R. 28, end of first paragraph)(citing Exhibit 7F, p. 6 and Exhibit 12F); however, the described treatment actually occurred a year later, in May 2008. (See R. 331-35, 594).

whether or not plaintiff "mentioned" surgery on that occasion. Surgery is discussed only in
Nurse Practitioner Barnes' treatment note for plaintiff's examination on March 2, 2007, in
which Barnes recorded Dr. Chung's earlier recommendation:

> other: pt brought MRI reports, dated 8/06, from private ortho/dr
> chung/montgomery, ala — showed significant cervical/lumbar degenerative
> dz and some herniations. . surgery was recommended

(R. 480; see R. 479-83). Barnes' treatment plan included, *inter alia*, that plaintiff "keep
pmr&s f/u on 3/21/07." (R. 480).[18] The "f/u on 3/21/07" to which Barnes referred was a
follow-up appointment with the physical medicine and rehabilitation clinic. (R. 479-81). At
that appointment, Dr. Goswami advised plaintiff to bring in the "films of MRI" to be referred
to a neurosurgeon in Birmingham. However, her treatment notes do not recommend surgery.
(R. 475).

Plaintiff returned to Nurse Practitioner Barnes on May 22, 2007. (R. 469-71). At the
conclusion of his physical examination notes, Barnes carried forward the same language that
he wrote in his notes for the March 2007 visit:

> other: pt brought MRI reports, dated 8/06, from private ortho/dr
> chung/montgomery, ala — showed significant cervical/lumbar degenerative
> dz and some herniations. . surgery was recommended

(R. 470). Barnes' assessment included, in pertinent part, "R wrist CTS/ significant cervical
and lumbar disc dx with some herniations – has seen our pmr&s docs." (Id.). Under "PLAN,"
Barnes advised plaintiff to "seek med attns stat if conditions worsens." Barnes' treatment

---

[18]   As set forth above, plaintiff did so. He saw Dr. Goswami, a "PM&RS" physician, according to
the title of her treatment note for March 21, 2007 (see R. 475); it appears that "PM&RS" is an acronym that
represents Physical Medicine and Rehabilitation (see R. 473-75).

plan did not, however, include any recommendation regarding surgery.  (Id.).

Plaintiff next sought treatment as a "walk in" from Dr. Ingram on November 21, 2007. He asked that his prescription for Lortab be renewed; after reviewing plaintiff's chart, Dr. Ingram prescribed the requested medication. Her note includes no indication that she recommended surgery.  (R. 458).

Against this background – in which the only actual recommendation by a doctor concerning surgery so far in plaintiff's course of treatment is still the provisional recommendation of Dr. Chung – the ALJ continues to assert that plaintiff is actively declining surgery. He writes:

– "[t]he claimant visited the clinic again on July 21, 2007 and requested a refill of his medications. He declined surgery."  (R. 28, bottom paragraph).[19]

– "On April 17, 2008 . . . . Surgery was again recommended."  (Id.).

– after the September 17, 2008 cervical MRI that was coded "abnormality, attention needed ... .The claimant declined surgery."  (R. 29, top paragraph).

– "On October 28, 2008, the claimant was seen at the clinic and reported that his COPD was worsening. No abnormalities were noted regarding his extremities. However based on the MRI results surgery was recommended again. The claimant declined surgery[.]" (Id.).

– at claimant's December 23, 2008 visit to the clinic, "[o]nce again surgery was

---

[19]  The ALJ's description of plaintiff's treatment "on July 21, 2007" (see R. 28, second paragraph, citing Exhibit 9F, pp. 48-50) pertains to treatment that actually occurred in 2008.  (R. 560-65).

mentioned and apparently dismissed by the claimant[.]" (Id.).[20]

However, the ALJ's findings are not supported by the record. As to the first of these observations, concerning plaintiff's allegedly declining surgery during a July 21, 2007, visit to the clinic, the ALJ has mistaken the date; this visit actually occurred one year later, on July 21, 2008. (R. 28, bottom paragraph). It will be discussed in turn below.

With regard to the ALJ's second note – that "On April 17, 2008 ... . Surgery was again recommended" – Nurse Practitioner Barnes, who examined plaintiff on this date, did not in fact make such a recommendation. (R. 443-46). Under "OBJECTIVE," his notes simply carry forward the same language again:

> other: pt brought MRI reports, dated 8/06, from private ortho/dr chung/montgomery, ala — showed significant cervical/lumbar degenerative dz and some herniations. . surgery was recommended

(R. 444).  Barnes' notes on this visit include the assessment, "LEU pain/ significant cervical and lumbar disc dz with some herniations – has seen our pmr&s and orhto [ortho] docs[.]" (Id.)  For the first time, Barnes added to his cervical and lumbar disc disease assessment that "— patient declines surgery." (Id.). However, Barnes' treatment plan did not include any recommendations regarding surgery. He advised plaintiff to "seek med attn stat if condition wors[en]s."  (Id.).

---

[20]   In his summary of the evidence regarding the recommendations of surgery and plaintiff declining surgery, the ALJ cites the following evidence by exhibit and page number: Exhibit 8F, pages 88-89 (the reference to surgery is actually at page 91) and Exhibit 9F, pages 16-22, 24, 32, 48-50.  For ease of reference, the court refers to the evidence by page number as indicated in the court transcript filed by the Commissioner. The evidence cited by the ALJ corresponds to pages 444, 528-34, 536, and 560-62 of the court transcript.

The ALJ's third comment concerns the September 17, 2008, cervical MRI that was coded "abnormality, attention needed ... .The claimant declined surgery." The record shows the following: Nurse Practitioner Barnes' treatment record for plaintiff's visit to the primary care clinic on July 21, 2008,[21] includes a note almost identical to Barnes' previous notes about plaintiff's lumbar and cervical MRIs.  Barnes wrote:

> other: *pt's previous* MRI reports, dated 8/06, from private ortho/dr chung/montgomery, ala — showed significant cervical/lumbar degenerative dz and some herniations. . surgery was recommended

(R. 560, modification from previous note italicized).  Nurse Practitioner Barnes' assessment included, *inter alia*, an assessment identical to the one he had made in April 2008:  "LUE pain/ significant cervical and lumbar disc dz with some herniations – has seen our pmr&s and orhto [ortho] docs — patient declines surgery[.]" (R. 560). In the "Plan/Interventions" section of his treatment note, Barnes notes that he advised plaintiff to "seek med attn stat if condition worsens" and "patient agrees"; Barnes scheduled a cervical MRI but included no recommendation for surgery. He advised plaintiff to return to the clinic in October as scheduled.  (R. 561).  The cervical MRI was completed on September 17, 2008; as the ALJ notes, the MRI report was coded, "ABNORMALITY, ATTN. NEEDED."  (R. 550).[22]

The ALJ's fourth comment relates to an October 28, 2008, visit to the clinic at which the ALJ suggests that, "based on the MRI results surgery was recommended again." In fact,

---

[21] This is the visit described by the ALJ as taking place one year earlier, on July 21, 2007.  (R. 28, bottom paragraph).

[22] The ALJ's summary suggests that plaintiff "declined surgery" on September 17, 2008 (R. 29, citing R. 536); however, the treatment note cited by the ALJ is actually for the December 23, 2008 evaluation by Nurse Practitioner Barnes (see R. 534-37), discussed *infra*.

when plaintiff returned to the clinic on October 20, 2008, for his follow-up visit with Nurse Practitioner Barnes, (R. 544-46; see also R. 561 (Barnes note to "rtc in oct as scheduled")), Barnes' treatment note merely duplicated the language from plaintiff's previous office visit:

> other: pt's previous MRI reports, dated 8/06, from private ortho/dr chung/montgomery, ala — showed significant cervical/lumbar degenerative dz and some herniations. . surgery was recommended

(R. 544).  His assessment also duplicated the language from his July 2008 treatment note, "LUE pain/ significant cervical and lumbar disc dz with some herniations – has seen our pmr&s and orhto [ortho] docs — patient declines surgery[.]" (Id.).Under "Plan/Interventions," Barnes again indicated plaintiff's agreement to "seek med attn stat if condition worsens" and, *inter alia*, that plaintiff should return to the clinic in six months for fasting labs and examination.  Barnes' treatment plan did not include any note regarding surgery.  (R. 545).

The ALJ's final comment – that on plaintiff's December 23, 2008, visit to the clinic, "[o]nce again surgery was mentioned and apparently dismissed by the claimant[.]" – the record reflects that when Nurse Practitioner Barnes examined the plaintiff on that date (R. 534-39), he again carried forward – *verbatim* – the language from his treatment notes of July and October 2008:

> other: pt's previous MRI reports, dated 8/06, from private ortho/dr chung/montgomery, ala — showed significant cervical/lumbar degenerative dz and some herniations. . surgery was recommended

(R. 534). Barnes' treatment note incorporated the report of the cervical MRI conducted in September 2008.  (R. 535-36; compare with report at R. 362, 550). Barnes' assessment

included, *inter alia*, "Chronic LUE pain/ significant cervical and lumbar disc dz with some herniations – has seen our pmr&s and orhto [ortho] docs — patient declines surgery[.]" (R. 536).[23]  In his notes for "Plan/Interventions," Barnes wrote that he had reviewed the recent test results with the "vet" and, again, noted his patient's agreement to "seek med attn stat if condition worsens."  (R. 536).[24]

In summary, the medical record reflects that, in August and early September of 2006, Dr. Chung thought that lumbar surgery was appropriate and that plaintiff might also need cervical surgery; he referred plaintiff to Dr. Holt for further evaluation of his lumbar and cervical degenerative disc disease "to see if surgery is best at this time" (R. 293) or "to see if surgery is beneficial" (R. 289).  Dr. Holt's recommendation, if he made one, is not in the record. On March 2, 2007, plaintiff gave the private-physician MRI reports to his VA treating nurse practitioner who, upon reviewing them, noted in plaintiff's medical record that the MRIs showed significant cervical and lumbar degenerative disc disease and some herniations, and that "surgery was recommended."  (R. 480).  Nurse Practitioner Barnes carried this information forward in his treatment notes for all of his subsequent office visits with the plaintiff.  (R. 444, 470, 534, 544, 560).  On April 17, 2008, Barnes includes the first

---

[23]  Barnes' assessment also included "bilateral wrist cts – pt declines surgery."  (R. 536).

[24]  In his discussion, the ALJ cites this page of the record – R. 536 or page 24 of Exhibit 9F – as support for his statement suggesting that the plaintiff declined surgery at the time of or just after the September 17, 2008 cervical spine MRI and before the October 20, 2008 treatment visit.  (See R. 29, middle of top paragraph).  He concludes his summary of the evidence by noting that, on December 23, 2008, "[o]nce again surgery was mentioned and apparently dismissed by the claimant."  (R. 29, end of top paragraph).  He cites the treatment record at R. 528-34, or pages 16 through 22 of Exhibit 9F.  All of these cited pages of the record fall within the treatment notes for December 23, 2008; they do not reflect two separate instances of treatment  (or two separate surgery recommendations/refusals) as the ALJ suggests.

notation that plaintiff had seen "our . . . or[th]o docs" and "patient declines surgery." (R. 444). Barnes thereafter included these identical notations in his records for all of plaintiff's subsequent quarterly office visits in 2008. (R. 534, 544, 560). While it is certainly possible that VA orthopedic physicians recommended surgery for plaintiff's lumbar and cervical degenerative disc disease, the court has located no evaluation report by a VA orthopedic doctor recommending lumbar and/or cervical surgery at any time around Barnes' April 2008 notation or, for that matter, at any time after plaintiff's evaluation by Dr. Chung in 2006.[25] At the administrative hearing, in response to the ALJ's question about whether "they" – not further identified by the ALJ – had recommended surgery on his neck and "low back," plaintiff responded that he "believe[s] so," and that he is sure of this as to his "low back." (R. 58-59). The only such physician recommendation actually included in the record is the tentative recommendation of Dr. Chung.

It is clear from plaintiff's testimony that someone – Dr. Chung and/or someone else – recommended to the plaintiff that he have back surgery and, possibly, neck surgery and that the plaintiff declined to have such surgery. The record also establishes that plaintiff's treating nurse practitioner (not a physician) included in his treatment notes – for every visit after March 2, 2007 – a description of plaintiff's private-physician MRI reports from 2006 including the notation that "surgery was recommended" and, also – for the quarterly visits in 2008 – the comment that the "patient declines surgery" at the end of the assessment of

---

[25] Plaintiff did have a VA orthopedic consultation in November 2005 regarding carpal tunnel surgery. (See R. 217).

significant cervical and lumbar degenerative disc disease. However, these notations by Nurse Practitioner Barnes cannot fairly be understood to mean that on each of the visits beginning in March 2007, Barnes recommended surgery to the plaintiff or that plaintiff declined to follow a recommendation for surgery on each of these occasions. Thus, the record does not include substantial evidentiary support for the ALJ's pronouncements that "every physician the claimant visited recommended surgery," and that "VA personnel have religiously broached the subject of surgery with the claimant and he has failed to heed their advice" (R. 30).

The remaining reasons for denial of benefits articulated by the ALJ relate to the absence of particular evidence in the record – *i.e.,* that "[t]here is not a single medical note suggesting that the claimant cannot sit, stand, or walk[,]" and (after his statement that "every physician the claimant visited recommended surgery), "[t]here is not a single note or suggestion that not having surgery was a better course of action." (R. 30).  It is correct that there are no statements from medical providers to this effect, as the ALJ observes, included in the medical evidence of record. However, the absence of any such notes does not constitute an adequate reason for the ALJ's adverse credibility determination regarding plaintiff's testimony of symptoms resulting from the impairments of his "neck, back, and spine" (see R. 30), particularly in view of the ALJ's exaggeration of the number and nature of the recommendations for surgery and the many inaccuracies in the ALJ's summary of the evidence.

Additionally, the ALJ's alternative conclusion – *i.e.*, that even if plaintiff were found

to be disabled, he "failed to follow medical treatment" and that "following the advise and repeated urges to have surgery given by the claimant's doctors would have resulted in definite improvement in his alleged disabling conditions, and would have restored the claimant to Substantial Gainful Activity" (R. 30) – is not supported by any evidence of record.[26]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ committed reversible error in his credibility assessment and, further, that the ALJ's alternative basis for a denial of benefits is not supported by substantial evidence. The decision of the Commissioner is, accordingly, due to be REVERSED and this action REMANDED for further administrative proceedings.[27]   A separate judgment will be entered.

DONE, this 14th day of June, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[26]   To support the denial of benefits to an otherwise disabled claimant on the basis of failure to follow prescribed medical treatment, the medical treatment must have been "prescribed" by a physician – not just recommended – and the claimant must have failed to follow his physician's prescription without a good reason. See 20 C.F.R. § 404.1530; Patterson v. Bowen, 799 F.2d 1455, 1460 -1461 (11th Cir. 1986); Myers v. Commissioner of Social Security, 2011 WL 1397474, 7 -8 (E.D.Mich. Feb 18, 2011), *report and recommendation adopted*, 2011 WL 1396789 (E.D. Mich. Apr. 12, 2011).

[27]   In view of this conclusion, the court does not reach plaintiff's remaining argument.